In the Matter of the Contested Case of
CHRISTIAN NURSING
CENTER, Relator,

v.

DEPARTMENT OF HUMAN
SERVICES, Respondent.

Nos. C1–87–1536, C4–87–1546.

Court of Appeals of Minnesota.

Feb. 2, 1988.

Dennis Neeser, Mark J. Schneider, Neeser & Darval, Willmar, for relator.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by FORSBERG, P.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

FORSBERG, Judge.

Relator Christian Nursing Center seeks review of an order by the Commissioner of Human Services, and also requests a judgment declaring certain Department rules invalid. By order of September 2, 1987, we consolidated the two proceedings. We affirm the Department's order, and decline to declare the disputed rules invalid.

## FACTS

Relator Christian Nursing Center ("CNC") is an 86–bed nursing home located in Willmar, Minnesota. CNC began opera-

tion in 1965, and is a participant in the federal Title XIX Medical Assistance Program.

Before 1980, CNC was the sole business of the Christian Rest Home Association ("Association"). In 1980, the Association began another business in the City of Willmar, an apartment building for elderly persons known as the Christian Living Center ("CLC"). CLC is not a nursing home, and is not entitled to payment under the Medical Assistance Program.

To fund CLC, the Association obtained a $2.9 million loan. The Association mortgaged both CLC and CNC as collateral for the loan, and agreed that in the event of default, the bank could foreclose on both CLC and CNC as a single and combined parcel. As part of the financing, the Association was required to pay off a prior $50,000 debt of CNC, so that the bank would have a first mortgage on both CLC and CNC.

The CLC project was initially unsuccessful, and in March 1985, the bank gave notice of default and declared the entire outstanding principal balance on the loan to be immediately due and payable.

In order to avoid foreclosure on the loan, the Association sold the assets of CLC and CNC to two partnerships, P & K Enterprises I and P & K Enterprises II. The sole consideration paid by the partnerships for CLC and CNC was the assumption of the outstanding mortgage. The sale to P & K Enterprises was finalized on May 30, 1985.

In October 1985, P & K Enterprises requested an increase in CNC's nursing home rates, due to interest expenses incurred on $1,511,280 of the $2.44 million debt assumed when purchasing CLC and CNC. The Department of Human Services ("Department") disallowed the request for interest expenses, and CNC requested a contested case hearing. Following the hearing, an administrative law judge ("ALJ") determined that certain Department rules promulgated pursuant to statutory authority disallowed the inclusion of interest expenses based upon a change in ownership of a nursing home. Exceptions to the ALJ's report were filed, and the Commis-

sioner of Human Services affirmed the disallowance of the interest expense. CNC has appealed to this court from the Commission's order, and has also requested a declaratory judgment invalidating the Department rules.

## ISSUES

1. Do the Department rules in question exceed the authority granted by statute?

2. Did the Commissioner's interpretation of the rules constitute an improper promulgation of a new rule?

3. Are the disputed rules unreasonable per se?

4. Are the disputed rules unreasonable as applied?

## ANALYSIS

1. In 1983, the legislature directed the Department to begin revising its medical assistance reimbursement system from a system based upon historical costs to a system based upon operating costs and rental reimbursement. As part of the new legislation enacted to cover nursing home rate years beginning July 1, 1983 and July 1, 1984, the legislature stated:

> No adjustments shall be made as a result of sales or reorganizations of provider entities.

1983 Minn.Laws ch. 199, § 12 (now codified as Minn.Stat. § 256B.431, subd. 3(a) (1986)).

For rate years beginning on or after July 1, 1985, the new legislation provided in relevant part:

> In developing the method for determining payment rates for the rental use of nursing homes, the commissioner shall consider factors designed to:
>
> *     *     *     *     *     *
>
> eliminate any incentives to sell nursing homes[.]

1983 Minn.Laws ch. 199, § 12 (now codified as Minn.Stat. § 256B.431, subd. 3a(b)(3) (1986)). The above provisions indicate a legislative intent to discourage sales of nursing homes.

In 1985, pursuant to a legislative directive to promulgate rules to determine

payment rates, the Department adopted Minn.R. 9549.0060 (1987), which provides in part:

Subp. 5. **Allowable debt.** For purposes of determining the property-related payment rate, the commissioner shall allow or disallow debt according to items A to D.

A. Debt shall be limited as follows:

(1) Debt incurred for the purchase of land directly used for resident care and the purchase or construction of nursing home buildings, attached fixtures, or land improvements or the capitalized replacement or capitalized repair of existing buildings, attached fixtures, or land improvements shall be allowed. Debt incurred for any other purpose shall not be allowed.

\* \* \* \* \* \*

(4) An increase in the amount of total outstanding debt incurred after May 22, 1983, as a result of a change in ownership or reorganization of provider entities, shall not be allowed and the previous owner's allowable debt as of May 22, 1983, shall be allowed * * *.

Subp. 7. **Allowable interest expense.**

\* \* \* \* \* \*

A. Interest expense is allowed only on the debt which is allowed under subpart 5 * * *.

Applying the above rules in the present case, the Commissioner adopted the following reasoning by the ALJ:

Both parties agree that prior to May 30, 1985, the $2.447 million debt was unrelated to resident care. Although CNC was mortgaged as part of the 1980 financing to build CLC, it was really only a form of collateral; all of the debt was attributable to CLC. There was no debt related to CNC. However, the nature of this debt changed as a result of the May 30, 1985 transaction between the Association and P & K Enterprises. At this time a change in ownership occurred; P & K Enterprises purchased a nursing home (CNC) and an apartment complex (CLC) in consideration for P & K Enter-

prises' assuming the $2.447 million. Part of this purchase price (debt assumption) must be allocated to the nursing home, and technically considered a "debt incurred for the purchase of land directly used for resident care" as defined in Rule 9549.0060, subp. 5.A.(1).

However, subp. 5.A.(1) does not control in this situation. Rather, the legal effect of this purchase is governed by subp. 5.A.(4) which specifically disallows an increase in debt when ownership changes. In this case, the ownership of CNC changed, and because debt was allocated to the nursing home as part of the assumption, as P & K Enterprises argues, there was clearly an increase in the amount of allowable debt on the nursing home facility. Thus, no interest expense on any amount of the debt in excess of the balance of the $50,000 debt which remained as of May 23, 1983 is permitted under Rule 9549.0060, subp. 7.A.

(Footnote omitted.)

The Commissioner also adopted the ALJ's reasoning that such result was consistent both with the state legislation and with the following federal legislation requiring that states participating in the medical assistance program disallow increased reimbursement to nursing facilities based on a transfer of ownership:

[T]he State shall provide assurances satisfactory to the Secretary [of Health and Human Services] that the payment methodology utilized by the State for payments to hospitals can reasonably be expected not to increase such payments, solely as a result of a change of ownership[.]

42 U.S.C.A. § 1396a(a)(13)(B) (West Supp. 1987).

CNC claims that the Department's promulgation of a rule disallowing an increase in debt due to "change in ownership" exceeds the statutory authority granted by Minn.Stat. § 256B.431, which merely directs the Commissioner to consider factors designed to "eliminate any incentives to sell nursing homes." This issue has been correctly raised in the context of CNC's request for a declaratory judgment:

The validity of any rule may be determined upon the petition for a declaratory judgment thereon, addressed to the court of appeals, when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner. The agency shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, and whether or not the agency has commenced an action against the petitioner to enforce the rule.

Minn.Stat. § 14.44 (1986). Minn.Stat. § 14.45 (1986) provides the following scope of review:

In proceedings under section 14.44, the court shall declare the rule invalid if it finds that it violates constitutional provisions or *exceeds the statutory authority of the agency* or was adopted without compliance with statutory rulemaking procedures.

(Emphasis supplied.)

■ In determining whether use of the term "change in ownership" in the rule exceeds the Department's authority to consider factors designed to eliminate incentives to "sell" nursing homes, it is important to recognize that there are three types of rules: procedural, legislative and interpretative. *McKee v. Likins,* 261 N.W.2d 566, 577 (Minn.1977). Interpretative rules are promulgated to "make specific the law enforced or administered by the agency," while legislative rules are promulgated "pursuant to delegated powers to make substantive law, and, in contrast to in-

terpretative rules, have the force and effect of law." *Minnesota–Dakotas Retail Hardware Association v. State,* 279 N.W. 2d 360, 364–65 (Minn.1979) (footnote omitted).

■ Here, the legislature delegated to the Department the authority to make substantive law; i.e., to develop methods for determining payment rates. We therefore believe Minn.R. 9549.0060 is a legislative rule.[1]

In *Hopf,* when considering whether a regulation was within the granted power, the court stated:

A commission has "an implied power to formulate necessary classifications and definitions within the designated area of regulation."

*Id.,* 323 N.W.2d at 752 (quoting *Welsand v. State of Minnesota Railroad & Warehouse Commission,* 251 Minn. 504, 509, 88 N.W.2d 834, 838 (1958) (footnote omitted)). The *Hopf* court determined that a commission had the authority to determine the location from which a distance required by statute should be measured. The court looked at the reasonableness of the rule in light of the statutory purpose.

In *Manufactured Housing Institute v. Pettersen,* 347 N.W.2d 238 (Minn.1984), the court upheld a legislative rule against a challenge that it exceeded the authority granted by the enabling act. Again, the court looked to the reasonableness of the agency's rule in light of the statutory purpose, and upheld the rule "considering the weight to be given and agency's interpretation of a statute it is charged with administering." *Id.* at 242 (citation omitted).

1. *See White Bear Lake Care Center, Inc., v. Minnesota Dep't of Public Welfare,* 319 N.W.2d 7, 8 (Minn.1982) (recognizing the prior department rule ("Rule 49") as an authorized and properly promulgated legislative rule); *see also State by Spannaus v. Hopf,* 323 N.W.2d 746 (Minn.1982) (regulation adopted pursuant to statutory authority was legislative rule where the statute granted the Commissioner of Transportation authority "to promulgate rules and regulations governing the erection and maintenance of outdoor advertising devices as may be necessary to carry out the policy of the state declared in this chapter". (Minn.Stat. § 173.185, subd. 2 (1980)). *But cf. Minnesota–Dakotas Retail Hardware Ass'n,* 279 N.W.2d at 364, 365 (interpretative rule where statute authorized the adoption of rules and regulations to implement provisions of a statute authorizing the Consumer Services Section of the Department of Commerce to act as the representative of the Governor; to enforce the provisions of the law relating to consumer fraud; to make recommendations to the legislature; and to receive registration statements and annual reports from certain persons).

Similarly, in the present case we find the Department's use of the phrase "change in ownership" to be reasonable in light of the legislative purpose of discouraging sales of nursing homes.

██ 2. CNC claims also that the Department should not have interpreted the phrase "change in ownership" to apply where CNC was purchased in order to avoid a foreclosure. CNC argues that this interpretation of the meaning of "change in ownership" constituted an improper promulgation of a new interpretive rule.

In *Cable Communications Board v. Nor-west Cable Communications Partnership*, 356 N.W.2d 658 (Minn.1984), the supreme court stated:

> Because the Board rendered an interpretation of its rule, the question presented is whether the Board's definition * * * was a permissible interpretation of its current rule or an improper promulgation of a new rule. Generally, if the agency's interpretation of a rule corresponds with its *plain meaning*, or if the rule is ambiguous and the agency interpretation is a longstanding one, the agency is not deemed to have promulgated a new rule.

*Id.* at 667 (emphasis supplied) (citing *White Bear Lake*, 319 N.W.2d at 8). Here, since the Department's interpretation of its rule has not been long-standing, the relevant question must be whether the interpretation is consistent with the "plain meaning" of the rule. The rule provides that interest may not be recovered where it has been incurred as a result of a change in ownership. Here, CNC changed ownership; thus, the Department's disallowance of CNC's claim for interest is consistent with the plain meaning of the rule.

██ 3. CNC claims also that Minn.R. 9549.0060, subpts. 5.A. and 7.A. must be declared invalid because they are unreason-

able per se. In *Hopf*, the supreme court stated:

> [A legislative rule] "is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable."

*Id.*, 323 N.W.2d at 752 (quoting 1 K. Davis, *Administrative Law Treatise* § 50.03, at 299 (1958)). *Hopf*, however, involved an eminent domain proceeding involving the filing of a condemnation petition and a court action, rather than a declaratory judgment action to determine the validity of a rule, as is the case here. Again, the declaratory judgment statute, Minn.Stat. § 14.45, provides that this court may declare a rule invalid only if it finds the rule exceeds the statutory authority, was adopted without compliance with statutory rulemaking procedures, or violates constitutional provisions; the statute is silent regarding reasonableness.

Nevertheless, whether the test is defined in terms of "reasonableness" or "constitutionality," the test is the same: whether the rule "bear[s] some rational relation to the accomplishment of a legitimate public purpose[,]" *Pettersen*, 347 N.W.2d at 243; or whether the rule is "rationally related to the end sought to be achieved by the act." *Blocher Outdoor Advertising Co. v. Minnesota Department of Transportation*, 347 N.W.2d 88, 91 (Minn.Ct.App. 1984).

One of the ends which the statute seeks to achieve here is the elimination of any incentives to sell nursing homes. The Department rule disallowing reimbursement for interest costs incurred in selling a nursing home is rationally related to that end.[2]

4. Finally, CNC claims Minn.R. 9549.0060 is unreasonable as applied. Both the ALJ and the Commissioner determined that they lacked jurisdiction to determine the rule's reasonableness as applied, although

---

**2.** While CNC claims that the purpose of the statute is to encourage the provision of service to needy persons, another purpose is clearly to keep nursing rates down (which includes discouraging the sale of nursing homes and inclusion of new interest expenses in nursing home rates).

the Commissioner did address the reasonableness of the Department's actions.

■ The declaratory judgment statute, Minn.Stat. § 14.45, makes no provision for determining whether a rule is reasonable as applied. In *Minnesota Association of Homes for the Aging v. Department of Human Services*, 385 N.W.2d 65, 67–68 (Minn.Ct.App.1986) *("MAHA"), pet. for rev. denied* (Minn. June 13, 1986), this court, after quoting from Minn.Stat. § 14.45, stated:

> This pre-enforcement challenge must be distinguished from a contested case action where a rule is sought to be enforced against a particular party and the validity of the rule as applied to that party is adjudicated. *Manufactured Housing Institute v. Pettersen*, 347 N.W.2d 238, 240 (Minn.1984). In a pre-enforcement challenge,
>
> > the standard of review is necessarily more restricted. Broad and far-reaching scrutiny of a rule or regulation, based upon hypothetical facts, is a premature exercise by the judiciary * * *.
>
> *Minnesota–Dakotas Retail Hardware Ass'n v. State*, 279 N.W.2d 360, 363 (Minn.1979). Thus, the reasonableness of the rule *as applied* cannot be considered in this action. *Id.* at 363 n. 4. However, it may be considered in a contested case proceeding. *See Blocher Outdoor Advertising Company v. Minnesota Department of Transportation*, 347 N.W.2d 88, 91 (Minn.Ct.App. 1984).

(Emphasis in original.)

The Department claims that the reasonableness of a rule as applied may not be challenged in a contested case proceeding, even though language in *MAHA* and several other cases suggests otherwise. *See, e.g., Pettersen*, 347 N.W.2d at 240 ("in [a] contested setting, the validity of the rule as applied to a particular party is adjudi-

cated"); *Minnesota–Dakotas*, 279 N.W.2d at 363 ("[o]ur previous opinions have examined administrative rules or actions only in the context of specific circumstances of a contested application").

In *Broen Memorial Home v. Minnesota Department of Human Services*, 364 N.W. 2d 436 (Minn.Ct.App.1985), this court held that the validity of a rule may be reviewed either in a declaratory judgment action or upon appeal from a contested case proceeding if the question was adequately raised and briefed. The *Broen* court also stated:

> The reasonableness of a rule is viewed toward the end sought to be achieved and not in light of its application to a particular party. Broen's only argument is that the rule is unreasonable when applied to it. This argument is without merit.

*Id.* at 440.[3]

■ The Department has requested that we resolve the apparent conflict between *Broen* and *Pettersen*, *Minnesota–Dakotas* and *MAHA*. We believe these cases may be resolved in the following manner: while we may consider whether an agency's application of a rule is valid, we may not consider the validity of the rule itself as applied in a particular context. Minn.Stat. § 14.69 (1986) states:

> In a judicial review [of a contested case proceeding], the court may affirm the *decision* of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative *finding, inferences, conclusion, or decisions* are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or

arbitrary.

---

**3.** The *Broen* court also held that the Commissioner may not determine whether a rule is

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

(Emphasis supplied.) This review is limited to determining whether the decision, findings, or inferences are erroneous; review of the actual rule itself is not contemplated.

█ CNC claims the Department's application of Minn.R. 9549.0060 was unreasonable because: (1) CNC's prior owner was not motivated to sell CNC for a profit, but was rather motivated by the impending foreclosure; (2) CNC's buyer, P & K Enterprises, was not motivated by profit; (3) if the Department's decision is allowed to stand, CNC will not be able to compete with other nursing homes; and (4) preventing the foreclosure and continuing CNC actually eliminated any incentive to sell CNC.

None of these concerns persuade us that the Department's application of the rule was unreasonable. In particular, we note that there is no evidence in the record regarding profit motivation. In addition, CNC's argument that preventing the foreclosure eliminated any incentive to sell CNC is absurd: CNC was in fact sold.

### DECISION

The order of the Commissioner is affirmed. Rule 9549.0060, subpts. 5.A.(1), 5.A.(4), and 7.A. of the Minnesota Rules is not invalid, and was not unreasonably applied.

Affirmed.